* * * * * * * * * * *
The Full Commission reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Ledford and the briefs and oral arguments before the Full Commission. The appealing party has not shown good ground to reconsider the evidence; receive further evidence; rehear the parties or their representatives; or amend the Opinion and Award, except for minor modifications. Accordingly, the Full Commission affirms the Opinion and Award of Deputy Commissioner Ledford with modifications.
 * * * * * * * * * * *
The Full Commission finds as fact and concludes as matters of law the following which were entered into by the parties as:
 STIPULATIONS *Page 2 
1. The date of the Plaintiff's accident is February 21, 2003.
2. The parties are bound by and subject to the North Carolina Workers' Compensation Act.
3. Liberty Mutual Insurance Company is the carrier for the employer, Red Simpson.
4. This claim was accepted by the carrier and medical and temporary total disability payments have been made by Liberty Mutual Insurance Company.
5. Plaintiff-employee's treating physician is Robert Caudle, M.D.
6. Plaintiff-employee sustained a knee injury in West Virginia when he fell approximately five feet into a ditch.
7. Plaintiff alleges that he reached an agreement with Candice Buchanan of Liberty Mutual Insurance Company to settle this claim for $97, 500.00 on April 14, 2005.
8. In April 2005, Candice Buchanan was a claims adjuster for Liberty Mutual Insurance Company and was assigned to this claim.
9. Candice Buchanan left employment with Liberty Mutual on May13, 2005.
10. A settlement agreement was prepared by Jennifer Ruiz, an attorney at Hedrick, Eatman, Gardner Kincheloe, and the agreement was sent to the Plaintiff-employee.
11. Plaintiff signed the settlement agreement and returned the agreement to Ms. Ruiz.
12. Plaintiff alleges that he may require a knee replacement as a result of his compensable injury, which is denied by the defendants. However, the parties agree that the cost of a total knee replacement is approximately $25, 000 to $30, 000.
 * * * * * * * * * * * *Page 3 ISSUES
1. Whether the parties entered into a valid and enforceable settlement agreement pursuant to the Workers' Compensation Act; and
2. Whether Plaintiff is entitled to attorneys fees pursuant to N.C. Gen. Stat. § 97-88.1.
 * * * * * * * * * * *
Based upon all of the competent evidence of record and reasonable inferences flowing therefrom, the Full Commission makes the following:
 FINDINGS OF FACT
1. Plaintiff was 31 years of age when he sustained an injury to his right ankle and right knee arising out of and in the course of his employment with Defendant Red Simpson, while working in West Virginia. Plaintiff did not finish high school but has his G.E.D. As a utility lineman for Red Simpson, Plaintiff engaged in strenuous activity, including climbing poles, walking lines and making repairs during ice storms.
2. The workers' compensation carrier Liberty Mutual accepted Plaintiff's claim as compensable and paid temporary total disability and medical compensation benefits.
3. Plaintiff was treated by Dr. Robert Caudle at Orthopedic and Sports Medicine in Raleigh, N.C. for the right knee injury. An MRI performed on March 13, 2003, revealed a medial meniscal tear in the right knee. On May 15, 2003, Dr. Caudle performed a right knee arthroscopy to repair the right medial meniscal tear. During this procedure, the torn meniscal tissue was removed from the knee.
4. Per Dr. Caudle's plan, following the surgery, Plaintiff participated in a vigorous physical therapy rehabilitation program. On October 28, 2003, Dr. Caudle's records reflect that *Page 4 
Dr. Caudle's assistant thought that Plaintiff had reached maximum medical improvement, and the assistant assigned a ten percent (10%) permanent partial impairment rating to Plaintiff's right knee. Plaintiff was released to return to full duty work.
5. In January 2004, Liberty Mutual sent Plaintiff a Form 21, which Plaintiff refused to sign. Plaintiff wrote the Industrial Commission saying he did not think the compensation was fair, particularly since he had lost his job because he could no longer perform the physical duties of his job.
6. On August 18, 2004, Plaintiff returned for an examination by Dr. Caudle. He was having problems with his knee and he described a burning-type discomfort, particularly with activity, and squatting. Dr. Caudle started Plaintiff on a physical therapy program.
7. On October 28, 2004, after examining Plaintiff, Dr. Caudle stated "I do not feel that he has reached maximum medical improvement at this time."
8. On February 15, 2005, Dr. Caudle noted that Plaintiff had persistent pain in the knee cap (patellofemoral pain) and tendinitis (iliotibial friction band syndrome) on the outside of his knee. Dr. Caudle wanted to start another physical therapy rehabilitation program and then re-evaluate Plaintiff in three months.
9. Physical therapy was initiated on March 7, 2005. It was reported that Plaintiff had pain in his knee at rest and with activity, an abnormal gait, and decreased knee strength. He was to be seen twice a week for four to six weeks in physical therapy.
10. Per the testimony of Dr. Caudle, Plaintiff is likely to have persistent symptoms and over time he is likely to have wear-and-tear type arthritis, a wearing away of the cartilage on the bone, on the inside half of the knee, where the torn cartilage was removed. The meniscus cartilage is between the bones, and the articular cartilage is on the bone. The cartilage serves as *Page 5 
a cushioning between the bones. As Dr. Caudle testified, Plaintiff is at risk of needing future medical treatment for his knee because he does not have enough normal cushion remaining in his knee. It is more likely than not that Plaintiff will have gradual worsening symptoms in his right knee as he ages.
11. Candice Buchanan was a Senior Claims Case Manager II for Liberty Mutual in 2005, and was employed by Liberty Mutual from April 1998 until May 13, 2005 in Tampa, Florida. She now works in a similar capacity for another insurance company in Tampa.
12. As a Senior Claims Case Manager II she handled catastrophic claims, complicated litigation and anything that had a high dollar value. She tended to get more complicated claims or older claims. Because Ms. Buchanan had been able to settle a lot of cases quickly, the company started giving her more and more cases that needed to be settled that other people could not get settled, and she was able to do it. She handled and settled a high volume of claims, and because of this ability she was nicknamed "The Liquidator." If no other case manager could liquidate the file, it would be given to her.
13. Several adjusters had handled Plaintiff's file before Ms. Buchanan got it. Future medicals were an issue, no permanent disability benefits had been paid, and Plaintiff had refused to sign a Form 21 submitted to him previously by Liberty Mutual.
14. Ms. Buchanan first picked up the Plaintiff's file on April 6, 2005. Ms. Buchanan talked with Plaintiff on one day, on or about April 14, 2005, and they reached a settlement agreement. Ms. Buchanan could not testify as to the exact settlement amount, but thought it was in the range of $25, 000. Per Plaintiff's testimony, the settlement amount agreed to was $97, 500.
15. Even though his education level is only a G.E.D., Plaintiff presents himself as intelligent and articulate. Plaintiff's wife has a B.S. in nursing, and was able to assist her *Page 6 
husband in researching issues of further medical treatment, including a possible knee replacement. During the settlement negotiations with Liberty Mutual, Plaintiff made settlement demands as high as $145, 000. At one time, a figure of $85, 000 was also discussed, although after researching the knee replacement issue, Plaintiff would not accept that amount. The end result was the settlement figure of $97, 500.
16. After the settlement figure was reached between Plaintiff and Candice Buchanan, Ms. Buchanan contacted Hedrick Eatman Gardner and Kincheloe, defense counsel for Liberty Mutual in North Carolina. The file was assigned to attorney Jennifer Ruiz for preparation of the settlement package, including the compromise settlement agreement. On April 28, 2005, Attorney Ruiz contacted Candice Buchanan by telephone, to determine the settlement amount. In her handwritten notes of April 28, 2005, Ms. Ruiz recorded that she had spoken with Candice ("Candy") Buchanan and that the Scott Chaisson case had been settled for $97, 500 and that Ms. Buchanan would email her the medical records. Ms. Ruiz would draft the settlement agreement, and was not involved in the settlement negotiations.
17. On May 25, 2005, Jennifer Ruiz, as an agent for the Defendant-carrier wrote a letter to Plaintiff advising that she represented the Defendants and that "I understand that a settlement has been reached in the amount of $97, 500." Ms. Ruiz advised that she needed a complete copy of his medical records in order to complete the compromise settlement agreement. This letter was copied to "Candy" Buchanan at Liberty Mutual. Ms. Buchanan had left her employment with Liberty Mutual on May 13, and it is not clear who may have reviewed the letter upon receipt by Liberty Mutual. However, no one with Liberty Mutual contacted Jennifer Ruiz to advise that there was any error in the settlement amount of $97, 500 reflected in her letter to Plaintiff. *Page 7 
18. Jennifer Ruiz prepared a Compromise Settlement Agreement, per the direction of her client, Liberty Mutual. The Compromise Settlement Agreement was mailed to Plaintiff with a cover letter from Ms. Ruiz dated June 9, 2005. Ms Ruiz requested that Plaintiff review and sign the agreement and return it to her office. After receiving the settlement agreement, which stated that the settlement amount was $97, 500.00, to be paid in one lump sum, Plaintiff signed the agreement and returned it to Ms. Ruiz's office.
19. By the time the agreement had been signed by Plaintiff and returned to Liberty Mutual, Candice Buchanan had left her employment. Although the agreement had been negotiated by Ms. Buchanan as an agent of Liberty Mutual Insurance Company, Liberty Mutual refused to sign the agreement, and took the position that the settlement amount was a mistake.
20. In her testimony, Candice Buchanan acknowledged that a settlement agreement was reached. However, she denied that the amount was $97, 500 and insisted that it was in the range of $25, 000. Ms. Buchanan produced no documentation to support her position that the settlement figure actually negotiated was in the range of $25, 000 rather than the $97, 500, which she communicated to Jennifer Ruiz. Liberty Mutual produced no records to substantiate their position that the $97, 500 figure was a "mistake."
21. Considering all of the evidence, the testimony of Candice Buchanan that the settlement amount was less than $97, 500 is not credible. The Plaintiff's testimony that the parties had negotiated a settlement of $97, 500 is supported by the greater weight of the evidence and is found to be credible. Liberty Mutual through their agent, Candice Buchanan, who was authorized to act on the carrier's behalf, negotiated a settlement with Plaintiff in the amount of $97, 500. This meeting of the minds was communicated to their attorney and agent Jennifer Ruiz and was reflected in documents prepared by Ms. Ruiz as the attorney and agent for the *Page 8 
Defendants, in her letter of May 25, 2005, her cover letter of June 9, 2005, and the settlement agreement itself.
22. Liberty Mutual knew, or should have known, that an agreement had been reached with Plaintiff, through its authorized agent, Candice Buchanan, to settle this claim in the amount of $97, 500. Between the time Plaintiff signed the Compromise Settlement Agreement and the time it was returned for signature by the carrier, there is no evidence of any change of circumstance, which would negate the negotiated settlement figure. No unknown facts came to light that would impact the carrier's ability to enter into the agreement. The carrier has failed to show any justification for the failure to follow through with the settlement agreement negotiated, and has acted in bad faith.
23. After Plaintiff learned that the carrier would not honor the Compromise Settlement Agreement, he sent the agreement to the Executive Secretary's office for enforcement. By Order filed August 30, 2005, the Executive Secretary's office denied the motion to enforce, and referred the matter for a hearing before a Deputy Commissioner. Plaintiff hired attorney Leonard Jernigan to represent him at the hearing before the Deputy Commissioner, and Mr. Jernigan filed a Form 33 with cover letter dated September 14, 2005.
24. The Defendant-carrier has acted in bad faith in refusing to honor the settlement agreement negotiated by their agent Candice Buchanan and reduced to writing by their agent and attorney Jennifer Ruiz. Plaintiff's counsel has requested an attorney's fee pursuant to N.C. Gen. Stat. § 97-88.1 in an amount equal to one-fourth of the compromise settlement amount of $97, 500, and that the same be awarded in addition to approval of the compromise settlement agreement and not deducted from the amount being paid to Plaintiff. In view of the bad faith of the carrier, and the additional efforts Plaintiff has been forced to make to enforce the *Page 9 
Compromise Settlement Agreement, including retaining an attorney, this request appears reasonable.
25. In considering the settlement agreement made on or about April 14, 2005, in the amount of $97, 500.00, in light of Plaintiff's injury, the extent of permanent impairment, and the possibility of the need for future medical treatment, and in reviewing the evidence of record in its entirety, as well as the medical records that were known to exist on or about April 14, 2005, when the settlement agreement was reached, the Full Commission finds that the agreement was fair and just and in the best interest of all parties, and should be approved.
 * * * * * * * * * * *
Based upon the foregoing stipulations and findings of fact, the Full Commission reaches the following:
 CONCLUSIONS OF LAW
1. As set forth in Lemly v. Colvard Oil Co., 157, N.C. App. 99 (2003), compromise settlement agreements "are governed by general principles of contract law." Lemley at 103, citing Chappell v. Roth, 353 N.C. 690,692, reh'g denied, 354 N.C. 75 (2001).
2. Although there was no written mediated settlement memorandum in this case as there was in Lemley, under general contract law, there is sufficient evidence to establish a "meeting of the minds." The credible evidence of record establishes that the Defendant-carrier, through their agent, Candice Buchanan, negotiated a settlement agreement with Plaintiff in the amount of $97, 500. This settlement amount was communicated to their attorney and agent, Jennifer Ruiz and was reduced to writing by Ms. Ruiz, in her cover letters and the compromise settlement agreement itself. Ms. Ruiz's written letters and the agreement she prepared are *Page 10 
sufficient to establish the agreement and bind the Defendants under general principles of contract law. Lemly v. Colvard Oil Co., 157, N.C. App. 99 (2003)
3. In considering the settlement agreement made on or about April 14, 2005, in the amount of $97, 500.00, in light of Plaintiff's injury, the extent of permanent impairment, and the possibility of the need for future medical treatment, and in reviewing the evidence of record in its entirety, as well as the medical records that were known to exist on or about April 14, 2005, when the settlement agreement was reached, the Full Commission concludes that the agreement was fair and just and in the best interest of all parties, and should be approved. Rule 502 of the Workers Compensation Rules of the Industrial Commission.
4. The conduct of the Defendant-carrier, Liberty Mutual Insurance Company, has been in bad faith, and the Industrial Commission, ex meromotu, in its discretion, awards attorneys fees pursuant to N.C. Gen. Stat. § 97-88.1. An attorney's fee of $24, 375 (based upon 25% of the settlement amount of $97, 500) is assessed and shall be paid to The Jernigan Law Firm, and is to be paid in addition to, and not subtracted from, the $97, 500.00 which is to be paid to Plaintiff pursuant the terms of the compromise settlement agreement. Chavis v.Thetford PropertyManagement, Inc., 155 N.C. App.769, 573 S.E.2d 920 (2003).
 * * * * * * * * * * *
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 A W A R D
1. The Compromise Settlement Agreement is hereby APPROVED in the Amount of $97, 500.00. Liberty Mutual Insurance Company shall pay the amount of $97, 500.00 directly to the Plaintiff in a lump sum. *Page 11 
2. Liberty Mutual shall pay an attorney's fee of $24, 375.00 to The Jernigan Law Firm, which shall be paid in addition to the $97, 500.00 being paid to Plaintiff and will not reduce the amount being paid to Plaintiff.
3. The Defendants shall pay the costs of the proceeding. The carrier shall reimburse Plaintiff's costs as may be documented by his counsel, such as travel costs, and fees for copies of medical records and court reporting fees.
This 25th day of January 2008.
 S/___________________
 CHRISTOPHER SCOTT
 COMMISSIONER
 CONCURRING: S/_____________ BERNADINE S. BALLANCE COMMISSIONER
 S/_____________ DANNY LEE McDONALD COMMISSIONER *Page 1